## No. 10,105.

### JOHN B. YATES VS. SOUTHWESTERN BRUSH ELECTIC LIGHT AND POWER COMPANY.

This is an action for damages occasioned to a policeman, while on duty at the New Orleans National Bank, in this city, by an explosion of a part of the apparatus appertaining to its electrical installation.

It comes fairly within the principle of the code, that is to the effect that every one is "responsible not only for the damage occasioned by his *own* act, but for that which is caused by the *things* which he had in his custody" or control.

APPEAL from the Civil District Court, Parish of Orleans. *Tissot*, J.

---

*Braughn, Buck, Dinkelspiel & Hart* for Plaintiff and Appellee:

1. Where plaintiff has proved the allegations of his petition, and shown a want of skill, incapacity or negligence on the part of defendant, and has proven his damages, he is entitled to recover.

2. "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." C. C., Art. 2315.

"Every person is responsible for the damages he causes, not merely by his act, but by his negligence, his imprudence, or his want of skill." C. C., Art. 2316.

3. In estimating damages the court must be guided by the evidence in the record. Where the verdict of the jury is not manifestly excessive, and where the court can feel no certainty that any modification thereof would come nearer to exact retribution, the Supreme Court is not justified in disturbing it. 37 Ann. 92.

In such case the verdict of the jury will not be disturbed on appeal, unless manifestly erroneous and glaringly unjust. 37 Ann. 226.

4. Courts will not look with much respect or sincerity or good faith on litigants when they

set up a frivolous defense. Such tactics operate against them in case of conflict of testimony. 23 Ann. 674.

5. When the testimony of a witness is contradictory, the one swearing affirmatively and giving detailed circumstances will preponderate. 26 Ann. 678.

6. The unimpeached testimony of a disinterested witness must be weighed, and cannot be disregarded by the court. 28 Ann. 682; 27 Ann. 308.

### E. M. Hudson for defendant and Appellant:

1. Under the general issue, plaintiff must prove all the facts necessary to a recovery. Parrot vs. Edwards, 19 La. 369. The general denial is leveled against, not only the simple averment of facts, but the compound statement of facts, with legal deductions therefrom. Durham vs. Williams, 32 Ann. 967.

2. Under the general issue, defendant may show any fact tending to prove that he is not indebted to plaintiff, as alleged. Bonnable vs. Bouligny, 1 R. 292.

3. The general issue reduces the controversy to the question of the truth or falsity of plaintiffs allegations, and the legal effect of the facts when proved. Wells vs. St. Dizier, 9 Ann. 119.

4. The rule that "parol contemporaneous evidence is inadmissible to contradict or vary the terms of a valid instrument," applies :—

(a) Only to contracts which are in writing. 1 Greenleaf on Evidence, § 275.

(b) Only in suits between the parties to the instrument.

And it cannot effect third parties, who, if it were otherwise, might be prejudiced by things recited in writings, contrary to the truth, through the ignorance, carelessness or fraud of other parties ; and who ought not, therefore, to be precluded from proving the truth, however contradictory to the statements of others. 1 Greenleaf, §§ 279, 211, 171 and 204; 2 Starkie on Evidence, 575.

5. Parol evidence is admissible to show error in descriptio loci et descriptio personæ stated in a receipt. 15 L. 311; 9 Ann. 29.

A receipt for money is not conclusive between the parties, but is open to explanation by parol. 5 Ann, 408; 1 Greenleaf, § 305.

6. In an action growing out of quasi-offenses, he alone is responsible, in damages, by whose fault the accident or injury was caused. C. C., Art. 3316.

7. A party alleging want of skill or diligence most prove the same. No damage will be allowed on a simple charge of negligence, imprudence or want of skill, unless the same be conclusively established. Kirk vs. Folsom, 23 Ann. 584 ; Rawson vs. Labranche, 16 Ann. 121.

8. The plaintiff must make his case certain, and the burden of proof is upon him to show that the alleged injury was the result of the negligence of the defendant. Stevenson vs. R. R. Co,, 35 Ann. 499 et seq.; 35 Ann. 697, and 36 Ann. 24, both citing Stevenson vs. R. R. Co., and re-affirming this doctrine.

---

The opinion of the Court was delivered by

WATKINS, J.   The plaintiff seeks to recover $3000 damages from the defendant company, on account of certain injuries he received while in the performrnce of duty in the building and property of the New Orleans National Bank, situated corner of Camp and Common streets, in the city of New Orleans—he being a member of Boylan & Farrell's police force at the time.   The averments of his petition are, that the accident of which he complains took place on the morning of the 26th of February, 1887, at the hour of 6 o'clock a. m., and that it was

occasioned by the explosion of a metal pipe, through which an electric wire passed conveying electricity into the building for the purposes of incandescent lighting, and by the force of the explosion fragments of the pipe were driven violently against his head, just behind the right ear, whereby he was felled to the floor, stunned and senseless for a time, and from which he received serious and permanent injury.

The defendant's answer was a general denial. The case was tried by a jury, who found for the plaintiff $2500, and the defendant has appealed.

## I.

From the record we have gleaned the following facts in regard to the manner in which the accident occurred, the causes which superinduced it, and the injuries the plaintiff sustained by it.

It appears that on the morning in question the plaintiff went on duty at the bank at 5 A. M., and about an hour afterwards his attention was arrested by an electrical illumination which appeared over the door which opens into the president's room, and which is situated on the Camp street side of the building, facing Common street, He was standing about midway of the floor and between this room and the desk of the paying teller. A moment afterwards a blaze was discovered in the wood work over the desk of the paying teller, which he hastened to extinguish, and while thus engaged the brass pipe, through which the electric wire connected with the electro lear, exploded, and a blow was inflicted on his head and one on his back, which was turned towards the desk.

The shock was attended with a sound like that of the firing of a pistol, and the illumination it produced had the appearance of rockets or fireworks, and it continued, at intervals, for fifteen or twenty seconds.

The chandelier in the paying teller's apartment, into which the electric wire was introduced, was, at the time of the explosion, about twelve inches from his head.

This wire was insulated and passed through a metal pipe, and it was exploded, and the pipe also, by means of an usual exertion of electric force.

This was occasioned by a connection that was formed outside of the bank, on some part of the pole-line, with a wire carrying a higher tension of electricity than that which fed the incandescent lamps within the bank—that is to say, there was a contact on the outside of the bank of the wire which supplied the incandescent light inside with a wire carrying an arc current of high tension outside. The

effect of this contact was to pass the arc current into the bank, and, this current being beyond its capacity, an electrical explosion was produced, and the heat fused the metal and bursted the pipe.

In every electrical installation there is, necessarily, a safety fuse or safety catch, which is a mechanical contrivance that interpolates into the line of electric conductors a small piece of lead wire, the effect of which is that when an abnormal amount of electricity flows over the wire of the circuit it becomes melted by the excessive heat engendered and the current is broken.

These devices are intended to secure additional safety to persons using incandescent lights.

The one over the desk of the paying teller had, in this instance, lost its cover and its internal part was charred and defaced. The metal was melted and the wood work burned. It had operated, but not in the right way. There were evidences of burning on the electro lear as well as the fuse-catch.

There is no reasonable doubt of the fact that the proximate cause of the accident was the insufficiency of fuse-catches, either in number or capacity, to break the circuit and cut off the flow of electricity from an arc wire on the outside of the bank.

The brass tube containing the insulated wire was of about one-twentieth of an inch in thickness and one-fourth of an inch in diameter, and the fragments of it which inflicted the wound on the plaintiff's head were about two and one-half inches in length. Their edges were jagged and rough, and the metal was tarnished and discolored.

The tension of an arc current of electricity passing through a tube of such dimensions was quite sufficient to have exploded it and send the fragments against the plaintiff's head with sufficient violence to have produced the injuries he received.

The immediate effect of an arc current of the voltoge this one appeared to have, when exercised upon an individual, would be that of a heavy blow, and might cause, at least, temporary insensibility.

From the blow inflicted there was a knot raised on plaintiff's head, which is described by one witness as being of the size of a hen's egg. He was stunned and felled to the floor and rendered insensible for a time. He became quite sick from the effects of it, and vomited considerably. He became, on that account, unfitted for duty, his hearing in his right ear being seriously impaired.

Since the happening of the accident, attacks, similar to those described, have occurred frequently, though at irregular intervals, and last three or four hours at a time; and the plaintiff states that he

experiences from them a great pressure on the right side of his head, above and behind his right ear, coupled with intense pain and dizziness.

One of his medical attendants states that, upon making an examination of the plaintiff's ear, he discovered *tinnitus*—i. e., a buzzing or humming in the ear—and the ear-drum congested, which was likely to produce inflammation of the ear-drum and impair the hearing.

Having heard the plaintiff's testimony, he gave it as his professional opinion that, while the plaintiff may be comparatively free from trouble at times, his affliction will continue during life time.

Since the accident the plaintiff has lost considerably in flesh, and has not been able to perform much work; and, indeed, it was stated by his counsel in argument, and not disavowed by counsel of the defendant company, that on account of his being unable to perform satisfactory service he had been discharged from employment at the bank.

At the date of this occurrence he was about fifty-two years of age, but strong, athletic and in perfect health. He is and has always been a laboring man. He has resided in this city ever since 1873, and has been regarded as faithful and efficient in the performance of any service assigned to him. He has a family dependent on him for support.

At the time of the occurrence he was employed at a stated salary of $45 per month—i. e., $540 *per annum*.

Manifestly this accident, and consequent injury to the plaintiff, was caused by the failure of the party establishing the electric installation in the bank to provide a means, so essential to the safety of those using electric lights, as the proper fuse-catches.

The happening of such an accident as the one under consideration may frequently occur in a large city like New Orleans, lighted externally and internally by electricity, which is generated by machines of different size, and the currents of which differs greatly in tension.

Indeed, the difference in the polarity of the metals brought in contact would naturally produce combustion and explosion, at the great risk of the population and hazard of property. To pass these differing currents of electricity from the generating machines to the various customers on the circuit and to the lamps on the streets a number of wires are employed, and they are strung on posts; and it is the plain duty of the persons exercising so dangerous a franchise to have especial care in their adjustment and installation, that their patrons,

their servants and agents be protected from loss and danger. Such care was not taken in this instance.

The proof shows that there was provided, in the electric installation of the bank, what was termed a switch, the purpose of which is to enable a customer who is desirous of discontinuing the current at any time to cut it off. But it appears that this switch was placed on the wall at the head of the stair-case leading to the second floor. That in order to reach it one had to pass out of the bank into Common street, thence to the rear of the building, and thence up the stairs. There was no other way of reaching it. In addition, the proof shows that neither the plaintiff, the janitor or officers of the bank had been advised of its *existence*, much less of its use or locality.

## II.

Under the general issue the defendant sought to prove that the defendant company did not establish the electric installation in the New Orleans National Bank, and was not responsible on that account; and that if any one was responsible, it was the Storage Battery Company, by whom the installation was erected in the bank. On this issue the testimony took a very wide range, and is, unfortunately, n conflict in many particulars. We can only cite a few of the leading features, as illustrating the view it has given us.

At the solicitation of certain persons, an officer of the defendant or Brush Company visited Rottterdam, Holland, in the summer of 1886 and purchased the right to sell and operate the De Khotinski patent for storing electricity of high tension, designed for distribution in low tension currents, for purposes of incandescent illumination.

In October of that year the Storage Battery Company was organized by the selection of a board of directors, and a secretary, treasurer, superintendent and president—all of whom, except the last, being like officers in the Brush Company.

The patentee furnished the accumulators for use as reservoirs in storing electricity.

The original contract and the company's charter are of this general tenor as to the objects of their organization.

The officers of the New Orleans National Bank claim to have made the contract for electric lighting with the Brush Company, and state that, after the accident, they gave notice to that company, and that they at once had it inspected and repaired without protest or objection·

The bills for the installation, as well as for lighting the bank during

January and February, 1887, were made out on the blanks of the Brush Company and were presented for payment by their collector.

The installation was directed by their superintendent.

During those months the Brush Company operated incandescent lights from its own generating machine.

The Storage Battery Company kept neither ledger, journal or stock book, and no certificates of stock were ever issued. Its accounts were kept in the books of the Brush Company.

There is no receipt showing payment to it of any bill for incandescent lighting.

Its minutes show that, during its brief potential existence, no contract was consummated with *any* company for incandescent lighting, and it had no system of its own.

The notes for the rent of No. 18 Royal street, where the accumulators were stored, were executed by the Brush Company.

The cash book of the Storage Battery Company shows that its *total revenue* up to the 9th of May, 1887, the date of its suspension, was $400 90. It shows that the total amount expended for material, antecedent to the accident, was $450 65.

That nothing was expended for lamps or electricity, or the power to generate it.

There are sundry invoices in the name of the Storage Battery Company for goods purchased of the Westinghouse Electric Light Company, in March and April, 1887, aggregating $10,000 in amount, while the cash book shows disbursements on that account of $398, only.

The minute book of that company shows that the president was only authorized, on the 24th of February, 1887, to contract with the Westinghouse Company for the purpose of supplying it with their system of incandescent lighting, and that on the 7th of May, following, it had not been consummated.

But, on the contrary, it appears that the Brush Company was operating the Westinghouse system *in April and May*, 1887, and they did not purchase from the Storage Battery Company.

These and various other *indicia* satisfy us that the Storage Battery Company was merely an auxiliary of the defendant; that it never owned or used any system of incandescent electric illumination, and that its only object was to furnish storage for electricity of high tension for distribution in low tension currents, for the greater convenience of the Brush Company.

On this theory the manifold incongruities in the evidence can be

harmonized and reconciled. The contention of the defendant, in this regard, cannot be sustained. The liability of the defendant is clearly made out.

### III.

This action is brought under those provisions of the Code which declare that "every act whatever of man that causes damage to another, obliges him through whose *fault* it happened to repair it;" (R. C. C. 2315) and "every person is responsible for the damage he occasions, not merely by his *act*, but by his negligence, imprudence or *want* of *skill*;" (R. C. C. 2316) and "we are responsible not only for the damage occasioned by our *own* act, but for that which is caused by * * the *things* which we have in our custody." R. C. C. 2317.

These articles need no elaboration. The text is concise and of easy appreciation. The instant case comes fairly within the principle of Barnes vs. Buren, 38 Ann. 320, and How vs. New Orleans, 12 Ann. 481, in each of which a person passing a street of this city was awarded damages for injuries inflicted by a falling wall.

The plaintiff is evidently entitled to remuneration at the hands of the defendant, but we think the amount allowed is excessive and should be reduced to $1250.

It is, therefore, ordered, adjudged and decreed that the verdict of the jury and the judgment of the court *a quo* be amended and reduced to $1250, and that, as thus amended, same be affirmed, with cost of appeal taxed against the plaintiff and appellee.